**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AUNT MARTHA'S HEALTH AND WELLNESS, INC., an Illinois not-for-profit corporation | ) ) ) ) | |
| Plaintiff, | ) ) | No. _____ |
| v. | ) ) | |
| VILLAGE OF MIDLOTHIAN, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) | |

**COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff, AUNT MARTHA'S HEALTH AND WELLNESS, INC. ("AUNT MARTHA's"), an Illinois not-for-profit corporation, by and through their undersigned counsel, complains of VILLAGE OF MIDLOTHIAN, an Illinois municipal corporation, Defendant herein, and alleges as follows.

**PRELIMINARY STATEMENT**

1)     AUNT MARTHA's is Illinois' only Federally Qualified Health Center that is also a licensed child welfare agency.  At the various facilities, including residential facilities, that it owns and operates throughout Illinois, each year AUNT MARTHA's provides access to medical, behavioral and mental health, dental, social and other services to thousands of low and no income children and adults, including wards of the Illinois courts and in the custody or under the guardianship of the Illinois Department of Children and Family Services ("DCFS") because of parental neglect, abuse, or abandonment ("DCFS Youth-In-Care").

2)      During the COVID-19 global pandemic, AUNT MARTHA's has continued to offer its services and facilities to DCFS Youth-In-Care whose health and lives have been placed at risk.

3)      In order to protect DCFS Youth-In-Care during this pandemic, AUNT MARTHA's has been operating a Children's Quarantine Center ("CQC") at one of its existing single-family dwellings ("single-family dwelling") located at 14401 S. Pulaski Road, Midlothian, Illinois.

4)      To further protect the lives, safety and health of DCFS Youth-In-Care residing at the CQC during their quarantine period, as well as AUNT MARTHA's staff serving those children and youth at the CQC, AUNT MARTHA's installed a $78,000 negative air pressure ventilation system so as to limit the spread of COVID-19 within the CQC.

5)      By April 20, 2020, the VILLAGE OF MIDLOTHIAN was fully aware that AUNT MARTHA's had housed at AUNT MARTHA's CQC, a DCFS Youth-In-Care with behavioral and mental impairments who had tested positive for COVID-19.

6)      On April 20, 2020, after VILLAGE OF MIDLOTHIAN officials had asked AUNT MARTHA's on April 6, 2020 whether it intended to house a "schizophrenic" youth at the CQC, the VILLAGE OF MIDLOTHIAN informed AUNT MARTHA's that its "goal of housing youth under 18 years of age, while laudable, is not possible in the Midlothian facility," deliberately and wrongfully misapplying zoning provisions and inapplicable building code requirements, declaring that "under no circumstances is AUNT MARTHA's permitted to accept residents between 0 to 18" unless AUNT MATHA's complied with its demand that it seek "at a minimum a text amendment to Midlothian's Zoning Code or a special use permit" and meet institutional building code requirements.

## NATURE OF ACTION

7)      This is an action for declaratory and injunctive relief brought pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended ("FHA"), 42 U.S.C. §3601 *et seq.,* Titles II and V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §1210 *et seq*., and its implementing regulation 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act of 1973 (Section 504), as amended, 29 U.S.C. §794 *et seq.,* and its implementing regulation 24 C.F.R. Part 8 brought to remedy the VILLAGE OF MIDLOTHIAN's discriminatory actions in refusing to allow DCFS Youth-In-Care to reside, be quarantined and be served by AUNT MARTHA's in a single-family dwelling based on the DCFS Youth-In-Care's disabilities and "familial status."

8)      Under its discriminatory policies, the VILLAGE OF MIDLOTHIAN discriminates against AUNT MARTHA's, and the DCFS Youth-In-Care served by AUNT MARTHA's with whom AUNT MARTHA's has a known association, on the basis of the DCFS Youth-In-Care's disabilities and "familial status" in applying the VILLAGE of MIDLOTHIAN's zoning ordinances and building codes to make unavailable a single-family dwelling for DCFS Youth-In-Care between 0-18 years of age, including DCFS Youth-In-Care who are or perceived to be disabled:

a.  by intentionally and wrongfully refusing in April and May 2020 to ***continue*** to apply its zoning ordinance 11-16-3 to classify the single family dwelling as a "Community Residence," a use under which AUNT MARTHA's since 2012 has served homeless young adults between 18-24 years of ages, and a use classified by the VILLAGE OF MIDLOTHIAN as a "Community Residence" since 2012, a discrimination ***on its face*** in that its zoning ordinance 11-16-3 defines "Community Residence" as a use that "includes residential facilities shared by disabled individuals, . . . minors, adjudicated wards of the Court (under the Illinois Juvenile Court Act or the Illinois Probate Act) . . .."

b.  by intentionally and wrongfully denying that it would allow AUNT MARTHA's to continue to use the single family dwelling as a "Community Residence" serving DCFS wards unless AUNT MARTHA's sought a "text amendment" to the VILLAGE OF MIDLOTHIAN's zoning ordinances or obtain a "special use permit," a discrimination ***on its face*** in that its zoning ordinance 11-6-2 provides that a "Community Residence"

3

is a "permitted use" in the "Community Commercial" zoning district where the single-family dwelling is located.

c.  by declaring that "under no circumstances" would the VILLAGE OF MIDLOTHIAN allow AUNT MARTHA's to "accept residents between 0 to 18 years of age" in the single-family dwelling unless AUNT MARTHA's complied with its zoning and building codes, including the stricter "institutional" use and occupancy standards equivalent to "nursing homes, psychiatric care facilities, etc.," intentionally and wrongfully denying AUNT MARTHA's building permit application for the remodeling and renovations of the single family dwelling in which the DCFS Youth-In-Care are to reside and be served.

d.  by refusing to make the reasonable accommodations to its rules, policies, and practices necessary to afford DCFS wards an equal opportunity to live and be served based on their disabilities and age.

## THE PARTIES

*Plaintiff Aunt Martha's Health and Wellness, Inc.*

9)    AUNT MARTHA's is an Illinois not-for-profit corporation, organized and existing under the laws of Illinois, with its principal place of business located at 19990 Governors Hwy, Olympia Fields, IL 60461. Its President and CEO is Raul Garza.

10)    AUNT MARTHA's is a federally funded Federally Qualified Health Center and has numerous medical professionals on staff, including a chief medical officer, psychiatrists and other medical professions including an infectious disease control nurse, among others.

11)    AUNT MARTHA's provides integrated healthcare, including primary care, mental health, and dental services; child welfare services, including foster care and congregate care; and other social services, such as crisis response, outreach, job development, and juvenile justice services, to more than 70,000 Illinois children and adults.

12)    AUNT MARTHA's offers its services at one or more of the facilities it owns or operates throughout Illinois, including the single-family dwelling it owns at 14401 S. Pulaski Road, Midlothian, Illinois.

4

*Defendant Village of Midlothian*

13)     The VILLAGE OF MIDLOTHIAN is an Illinois municipal corporation that is located in the Northern District of Illinois and is organized under the laws of Illinois.

14)     The VILLAGE OF MIDLOTHIAN is a "public entity" within the meaning of the Americans with Disability Act ("ADA"), 42 U.S.C. §1213(1).

## JURISDICTION AND VENUE

15)     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §§12133 and 12134; and 42 U.S.C. §3613. Appropriate declaratory relief is authorized by 28 U.S.C. §§2201 and 2202.

16)     Venue is proper in this Court pursuant to 28 U.S.C. §139l(b) because the Defendant VILLAGE OF MIDLOTHIAN resides in this judicial district and because a substantial part of the events giving rise to the plaintiff AUNT MARTHA's claims occurred in this judicial district.

## BACKGROUND

*The B.H. and N.B. Consent Decrees and Aunt Martha's*

17)     In 1988, a class action lawsuit titled: *B.H. v. Smith*, 88 CV 5599,[1] was filed against the Illinois Department of Children and Family Services ("DCFS") resulting in the entry of a consent decree. *Id.* Among other things, the *B.H. Consent Decree* seeks to reform a child welfare system in order to ensure the safety, permanence, and wellbeing of youth in care.[2]

18)     In 2015, according to counsel for plaintiffs in the *B.H. Consent Decree,* the American Civil Liberties Union ("ACLU"), reports of shortages of mental health services at residential treatment centers treating youth in care emerged. *Id.* As a result, the ACLU requested the Court to appoint experts to review the problem. *Id.* The Court appointed experts who assessed

---

[1] This matter is pending before United States District Judge Jorge Alonso of the Northern District of Illinois.
[2] *See*, https://www.aclu-il.org/en/cases/bh-v-sheldon (last visited May 10, 2020).

proposed solutions to the systemic deficiencies in the level of care for youth with mental and behavioral health needs. *Id.*

19)    In December 2018, the Court appointed a Special Master in the *B.H. Consent Decree*. *Id.*  Thereafter, the ACLU continued to advocate for the adequate development of services and resources for youth in care with high-end needs. *Id.*

20)    In January 2018, in a separate matter, a consent decree was entered in a case titled: *N.B. v. Eagleson,* 11 CV 6866.[3] The *N.B.* case involves the Illinois Department of Healthcare and Family Services ("HFS") and requires HFS to develop a system to deliver mental and behavioral health services to Illinois youth under the Early and Periodic Screening, Diagnostic, and Treatment Medicaid requirement. *Id.*

21)    According to the ACLU, *B.H.* class members make up roughly a third of the *N.B.* class, and are entitled to the protections under the *B.H. Consent Decree*. *Id.*

22)    AUNT MARTHA's serves DCFS Youth-In-Care with mental and behavioral health needs at one or more of its facilities including at its Integrated Care Center ("ICC") facility, whose rights are protected under both the *B.H* and *N.B. Consent Decrees*.

23)    On May 24, 2019, the parties in the *B.H. Consent Decree* entered into a stipulation and agreement, which stated, among other things that: "Aunt Martha's ICC, including the high acuity unit, is presently sufficiently staffed and operational to safely admit some youth with high end behavioral and mental health needs, though such youth should only be admitted when no more appropriate placement can be located." *B.H. v. Smith*, 88 CV 5599, Dkt. 699.

24)    Since May 2019, and prior to the time period, AUNT MARTHA's has served DCFS Youth-In-Care with behavioral and mental health needs at the ICC.

---

[3] This matter is also pending before the United States District Judge Jorge Alonso of the Northern District of Illinois.

*The COVID-19 Pandemic Emerges*

25)     COVID-19 is the infectious disease caused by the most recently discovered coronavirus. This new virus and disease were unknown before the outbreak began in December 2019 and is now a pandemic affecting many countries globally.[4]   In only a few months more than one million people worldwide have been diagnosed with COVID-19, and nearly 60,000 of those people have died.[5]

26)     COVID-19 is a particularly contagious disease that can survive for up to three hours in the air, as an aerosol, and can be directly transmitted by inhalation to other individuals in close proximity. The Centers for Disease Control and Prevention (CDC) and other public health agencies have universally prescribed social distancing—every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces—as the only ways to meaningfully mitigate the spread of this virus.[6]

27)     People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes.

---

[4] https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (visited April 23, 2020).
[5] https://www.worldometers.info/coronavirus/. (last visited May 10, 2020).
[6] Coronavirus Disease 2019 (COVID-19): How to Protect Yourself, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-gettingsick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019ncov%2Fprepare%2Fprevention.html (last visited Mar. 29, 2020).

28) On and after March 12, 2020, the Illinois Governor issued a series of Executive Orders relating to the COVID-19 outbreak to limit the spread of the virus by increasingly limiting gatherings of large groups of persons and restricting movement among and between residents.[7]

29) By March 21, 2020, AUNT MARTHA's became aware that certain Illinois foster parents had contracted COVID-19 requiring DCFS to identify safe locations to quarantine foster children, who are DCFS Youth-In-Care.

30) By March 22, 2020, news reports revealed that over 1,000 Illinoisans had contracted COVID-19.

31) According to the Illinois Department of Public Health, as of May 10, 2020, there were more than 77,741 confirmed cases of COVID-19 in Illinois, up from just 20 on March 18, 2020 and a reported 3,406 people have now died.[8]

**FACTS**

*2012-2020 "Community Residence" Use – Aunt Martha's Midlothian Homeless Program*

32) In 2012, AUNT MARTHA's acquired a single-family dwelling in the VILLAGE OF MIDLOTHIAN from the YMCA located at 14401 S. Pulaski Road, Midlothian, Illinois ("single-family dwelling").

33) AUNT MARTHA's acquisition and renovation of the single-family dwelling followed a United States Department of Housing and Urban Development grant that had been awarded to the YMCA to provide transitional housing for homeless young adults.

34) AUNT MARTHA's intended to use the single-family dwelling to provide a residential facility providing supportive and transitional housing for up to eight homeless young adults between the ages of 18-24.

---

[7] https://www2.illinois.gov/government/executive-orders (last visited May 10, 2020).
[8] https://www.dph.illinois.gov/covid19/covid19-statistics (last visited May 10, 2020).

35)     On June 21, 2012, the VILLAGE OF MIDLOTHIAN's Board adopted a "text amendment" to its zoning code at Section 11-16-3, defining one of the village's facility uses to provide, as follows:

"Community Residence, Large." This use includes residential facilities shared by 24-hour resident staff and seven (7) or more disabled individuals, elderly individuals, minors, adjudicated wards of the Court (under the Illinois Juvenile Court Act or the Illinois Probate Act, or individuals, who are 18 to 24 years of age, are not wards of the Court and who require specialized attention and care (including, but not limited to, life skill education, therapy or counseling) in order to achieve personal independence, who live together as a single housekeeping unit in a long-term, family-like environment, where staff provide care, and facilitate education and participation in community activities for the residents in order for them to live independently as possible in a residential environment, This use shall not include institutional "Assisted Living Facility", as defined herein, or an alcohol or drug treatment center, a work release facility for convicts or ex-convicts, or other facilities serving as an alternative to incarceration.

"Community Residence, Small." This use includes residential facilities shared by 24-hour resident staff and six (6) or less disabled individuals, elderly individuals, minors, adjudicated wards of the Court (under the Illinois Juvenile Court Act or the Illinois Probate Act, or individuals, who are 18 to 24 years of age, are not wards of the Court and who require specialized attention and care (including, but not limited to, life skill education, therapy or counseling) in order to achieve personal independence, who live together as a single housekeeping unit in a long-term, family-like environment, where staff provide care, and facilitate education and participation in community activities for the residents in order for them to live independently as possible in a residential environment, This use shall not include institutional "Assisted Living Facility," as defined herein, or an alcohol or drug treatment center, a work release facility for convicts or ex-convicts, or other facilities serving as an alternative to incarceration.

36)     AUNT MARTHA's single-family dwelling was situated on a lot in the VILLAGE OF MIDLOTHIAN's B-3 "Community Commercial" zoning district, a mixed use residential and commercial zoning district where a "Community  Residence" is a permitted use, that is, not requiring a special use permit.

37)     On information and belief, the VILLAGE OF MIDLOTHIAN amended its definition of "Community Residence" to allow the AUNT MARTHA's single-family dwelling to serve young adults between the ages of 18 and 24 years.

38)     On or after June 21, 2012, AUNT MARTHA's began and continued its use of the single-family dwelling in the VILLAGE OF MIDLOTHIAN as a "Community Residence, Large," providing supportive and transitional housing for up to eight homeless young adults between the ages of 18 and 24 years.

***Aunt Martha's Children's Quarantine Center Program Development***

39)     In mid-March 2020, DCFS began discussions with AUNT MARTHA's and other child welfare agencies in Illinois concerning the extent of their capacity in their residential facilities to provide a 24-hour care program for foster children who were wards of Illinois courts, in DCFS custody or under DCFS guardianship, and who have been exposed to or have contracted the COVID-19 virus, including those whose foster parents tested positive for or have symptoms related to the COVID-19 virus.

40)     By March 23, 2020, in response to the discussions with DCFS, AUNT MARTHA's proposed to establish – consistent with the "Community Residence" definition in Section 11-16-3 of the VILLAGE OF MIDLOTHIAN's zoning code - the Children's Quarantine Center ("CQC") at AUNT MARTHA's single-family dwelling in the VILLAGE OF MIDLOTHIAN.

41)     AUNT MARTHA's CQC program was designed to care for DCFS Youth-In-Care between 0-18 years of age who cannot safely remain in foster or other residential care and have a:

- Known Exposure to COVID-19 virus – Symptomatic (Mild/Moderate symptoms)
- Positive test for COVID-19 virus – Asymptomatic (No symptoms but for observation)
- Positive COVID-19 – Symptomatic (Mild/Moderate symptoms)

42)     DCFS Youth-In-Care would not be admitted to AUNT MARTHA's CQC program if the DCFS Youth-In-Care:

- has a medically complex diagnosis
- has a severe respiratory or cardiac condition, or
- has a compromised immune system

43)     AUNT MARTHA's CQC seeks to limit the potential risk of exposure to its staff and the community through, among other measures, the installation of a negative pressure HVAC system to contain airborne contaminants within each room, providing staff with appropriate personal protective equipment ("PPE"), intensive training of staff related to infection control, separating children based on gender, age, Diversity, Equity and Inclusion preferences in designated areas, the monitoring of symptoms and signs of each child, access to COVID-19 testing, minimizing risk of contamination and cross-exposure, and 24/7 security within and the use of extensive and existing video cameras in and around the single-family dwelling to prevent the unauthorized ingress of individuals to and unauthorized egress of the children from the single-family dwelling.

***Preparation for CQC's Continuing Use of the "Community Residence."***

44)     During March 2020, AUNT MARTHA's began re-locating the 18 to 24 year-old young adults then residing in the single-family dwelling to other locations, including hotels, where those young adults could continue to be served.

45)     On March 31, 2020, AUNT MARTHA's Director of Legal, Compliance, and Research Angelica Jimenez ("Jimenez") contacted the VILLAGE OF MIDLOTHIAN's Building Superintendent Nicholas Weinert ("Weinert") regarding the current zoning and permitted uses for the single-family dwelling.

46)     In response to Jimenez's inquiry, Weinert confirmed the current B-3 zoning applicable to the single-family dwelling, inquired about the current use of the property, and when informed by Jimenez that it was currently a homeless youth facility, Weinert informed Jimenez that it was not a permitted use.

47) Following Weinert's indication that the homeless youth facility was not a permitted use, Jimenez located the code provision that allowed for such a use, (namely the definition of "Community Residence"), and shared that citation with Weinert, to which Weinert indicated he did not agree.

48) On April 1, 2020, AUNT MARTHA's Chief Financial Officer Mary Martin ("Martin") and Chief Legal and Administrative Officer Jessica Cummings ("Cummings") contacted the VILLAGE OF MIDLOTHIAN's Building Superintendent Weinert regarding the need of AUNT MARTHA's to perform improvements to the single-family dwelling in order to provide a safe environment for up to eight (8) DCFS Youth-In-Care under 18 years of age as requested by DCFS during the COVID-19 pandemic, including:

   a. the installation of a negative air pressure HVAC system, similar to the type of HVAC system utilized in a hospital setting, to protect the health and safety of staff and the children to be served there; and

   b. the division of the larger bedrooms into smaller bedrooms for social distancing purposes.

49) In response, Weinert indicated that because of COVID-19, the VILLAGE OF MIDLOTHIAN Building Department offices would be closed until May 1, 2020 but that AUNT MARTHA's plans and permits could be approved in the interim and permit fees paid upon reopening of the office, instructing AUNT MARTHA's to submit an application for a building permit. Weinert also indicated that stricter building code requirements under the International Building Code would apply if more than five (5) residents occupy the single-family dwelling, to which Martin responded that AUNT MARTHA's would comply with any and all applicable building code requirements.

50)     By the end of March and early April 2020, AUNT MARTHA's had re-located to hotels all the 18 to 24 year-old young adults who had been residing in the single-family dwelling, which left the single-family dwelling unoccupied.

***The S.C. Youth Incident***

51)     On March 30, 2020, 19 year-old S.C., a ward of an Illinois court for whom DCFS was the guardian, was being prepared for discharge from the University of Illinois Chicago ("UIC") hospital, based on the hospital's decision that she no longer required in-patient care.

52)     Prior to her March 28, 2020 admission to the UIC hospital, S.C. had been provided care at AUNT MARTHA's Integrated Care Center ("ICC"), not the single-family dwelling in Midlothian which had previously only served 18-24 year old young adults who were not wards of an Illinois court and not in the custody or under the guardianship of DCFS.

53)     During S.C.'s multi-month stay at AUNT MARTHA's ICC, S.C. had multiple admissions to various hospitals related to her behavioral and mental health impairments which manifested in angry outbursts and physical aggression.

54)     On March 30, 2020, during preparations for S.C.'s discharge from the UIC hospital, AUNT MARTHA's learned that S.C. informed hospital staff that she had been experiencing upper respiratory issues, as well as symptoms of fever, and a cough for two days.

55)     On March 30, 2020, based on S.C.'s symptoms, the UIC hospital then tested S.C. for the COVID-19 virus. The test result was positive. At about this time, AUNT MARTHA's also consulted with the UIC hospital, the Illinois Department of Public Health ("IDPH") and the Chicago Department of Public Health regarding S.C's test results in order to obtain guidance on the nature of care and setting that would be appropriate and available for S.C. upon discharge from the UIC hospital.

56)     On April 1, 2020, AUNT MARTHA's engaged in continued consultations with DCFS and healthcare professionals regarding recommendations for post-hospitalization care. There was a consensus that S.C. would need at least seven days of isolation post onset of symptoms with 72-hours of being symptom free and 24-hours fever free without medication.

57)     On April 2, 2020, because of the lack of any other appropriate placement options and after consulting with DCFS, after S.C. was discharged in the evening from the UIC hospital, DCFS placed S.C. at AUNT MARTHA's single-family dwelling in Midlothian.

58)     Upon S.C.'s April 2, 2020 placement at AUNT MARTHA's single-family dwelling in Midlothian, S.C. was the sole resident at the single-family dwelling and AUNT MARTHA's staff remained onsite on a 24/7 basis to provide onsite services to S.C. in accordance with guidance provided to AUNT MARTHA's by various public health officials.

59)     Between April 3 and 5, 2020, the VILLAGE OF MIDLOTHIAN police were dispatched to the single-family dwelling at the request of AUNT MARTHA's staff on several occasions, each time transporting or arranging for the transportation of S.C. to area hospital emergency rooms due to S.C.'s physical aggression or threats to harm herself.

60)     AUNT MARTHA's staff informed the VILLAGE OF MIDLOTHIAN Police Department that S.C. had tested positive for COVID-19.

61)     Since S.C.'s admission to a Hospital on April 5, 2020, S.C. has not returned to AUNT MARTHA's single-family dwelling in Midlothian.

62)     On April 6, 2020, AUNT MARTHA's submitted a building permit application to the VILLAGE OF MIDLOTHIAN's Building Department requesting a permit to perform renovations on the single-family dwelling in order to install a negative pressure ventilation system

and divide existing bedrooms into additional smaller bedrooms. The permit application was supplemented with additional documentation on April 7, 2020.

63)    On April 6, 2020, Jimenez received a call from Weinert in which Weinert reported that he received an email from the VILLAGE OF MIDLOTHIAN police department about AUNT MARTHA's plans to convert the single-family dwelling facility to house a DCFS Youth-In-Care who tested positive for COVID-19. Weinert asked AUNT MARTHA's to confirm because Weinert did not want the police to enter without protective equipment.

64)    On April 6, 2020, Jimenez received a call from the VILLAGE OF MIDLOTHIAN's Chief of Police Daniel Delaney ("Chief Delaney") regarding incidents that occurred over the weekend, one of which involved a resident (Youth S.C.) who had tested positive for COVID-19 and was suicidal. During this call, Chief Delaney also stated that:

a.    This resident was apprehended by one of his officers, thus exposing him to the virus.

b.    That the officer had not returned to work as they were awaiting the test results.

c.    That the hospital discharged the resident and the next day she fled into the street where three more officers tried to apprehend her.

d.    That they have lost 20% of their patrol as a result.

e.    That he understands that AUNT MARTHA's has security on hand and wanted to know how they are addressing the situation.

f.    That he also said he wanted to know the plan for the building and the plan we have to mitigate this issue.

65)    On April 6, 2020, AUNT MARTHA's Chief Financial Officer Mary Martin ("Martin") called Weinert regarding the single-family dwelling. During Martin's telephone call with Weinert, Weinert said that Martin needed to call VILLAGE OF MIDLOTHIAN's Police Chief (Chief Delaney) immediately concerning the two incidents over the weekend with AUNT MARTHA's "schizophrenic" client who was in the middle of the street threatening harm to herself

and others, had pulled off the mask of the police officer and spit in his face, taking out 40% of the VILLAGE OF MIDLOTHIAN's police department.

66)     During the April 6, 2020 call, Weinert stated that the VILLAGE OF MIDLOTHIAN's Mayor got involved over the weekend and that the Mayor said he was not going to approve AUNT MARTHA's building permit.

67)     On April 6, 2020, following Martin's call with Weinert, Martin also spoke with Chief Delaney. During the call:

    a.  Chief Delaney asked Martin if AUNT MARTHA's planned on housing "schizophrenic clients" at the single-family dwelling in the future. Martin replied that AUNT MARTHA's had no such plans;

    b.  Martin explained that AUNT MARTHA's placed on a temporary basis only a 19-year old with behavioral health issues who had tested positive for COVID19, that the client was the sole resident at the time, and that AUNT MARTHA's made a clinical decision to house the DCFS Youth-In-Care there until the youth's quarantine period was over; and,

    c.  Martin explained that AUNT MARTHA's intended use was to provide care to DCFS Youth-In-Care 0 to 18 year at the site.

68)     On April 6, 2020, Cummings called Chief Delaney and left a voice message requesting to speak with him regarding the incidents that occurred over the weekend and the concerns he expressed to Martin.  Chief Delaney never returned Cummings' call.

69)      On April 8, 2020, Weinert sent an email to Martin stating that he had reviewed AUNT MARTHA's submittal and that the permit cannot be approved at this time.  Weinert further stated in his email this is not a simple remodel as discussed and that AUNT MARTHA's would be required to submit stamped architectural drawings for permit approval.

70)     On April 8, 2020, Cummings sent a letter to Weinert via email in which she:

    a.  Detailed AUNT MARTHA's need to renovate the single-family dwelling, including the installation of a negative pressure HVAC system to protect the health and safety of DCFS Youth-In-Care, staff, and the community;

b. Informed the VILLAGE OF MIDLOTHIAN that the single-family dwelling would be utilized as a Community Residence for youth ages 0-18 beginning April 22, 2020 even if AUNT MARTHA's was unable to make any renovations to the single-family dwelling;

c. Stated that given the current public health crisis AUNT MARTHA's considered its request to be an emergency request; and,

d. Asked that the VILLAGE OF MIDLOTHIAN reconsider its denial and issue a permit for the negative pressure HVAC system.

71) On April 8, 2020, Weinert responded to Cummings in an email and stated:

a. That the VILLAGE OF MIDLOTHIAN and AUNT MARTHA's share the same goals of protecting others;

b. Indicated that the VILLAGE OF MIDLOTHIAN has no problems with AUNT MARTHA's installing a negative pressure ventilation system;

c. Instructed AUNT MARTHA's to complete another permit application for installation of the negative pressure HVAC system.

72) On April 10, 2020, AUNT MARTHA's submitted to the VILLAGE OF MIDLOTHIAN a permit application to install the negative pressure HVAC system.

73) On April 13, 2020, AUNT MARTHA's contractor J.N. ("J.N.") attempted to contact Weinert multiple times regarding the permit and received no answer and no call back. J.N. also attempted to visit the VILLAGE OF MIDLOTHIAN Building Department in person, but despite observing activity in and around the building, there was no answer at the door.

74) On April 13, 2020, Cummings sent a letter to Weinert via email asking for a status update on the permit application and requesting that the permit be approved by April 15, 2020 in order to ensure that the negative pressure HVAC system could be installed prior to the scheduled opening of the CQC on April 22, 2020.

75) On April 14, 2020, the VILLAGE OF MIDLOTHIAN approved AUNT MARTHA's permit for installation of a negative pressure HVAC system only.

76)     On April 17, 2020, AUNT MARTHA's President and Chief Executive Officer Raul Garza ("Garza") sent a letter via email to the VILLAGE OF MIDLOTHIAN's Mayor, Weinert, and Delaney thanking them for issuance of the permit for installation of the negative pressure HVAC system.

77)     On April 20, 2020, the Illinois State Fire Marshall inspected AUNT MARTHA's single-family dwelling and indicated on the inspection report that "no violations were observed during this inspection." *See* Exhibit 1.

78)     On April 20, 2020 Cummings received a letter and exhibits via email from the VILLAGE OF MIDLOTHIAN's attorney Peter Murphy ("Murphy"). In the letter

   a. Murphy misstated the definition of "Community Residence" stating that it permitted to house 24-hour resident staff and disabled individuals 18-24 years of age,

   b. Indicated that AUNT MARTHA's use of the single-family dwelling to house youth under 18 would require at a minimum a text amendment to Midlothian's Zoning Code or a special use permit,

   c. Informed AUNT MARTHA's that the VILLAGE OF MIDLOTHIAN had adopted the International Building Code ("IBC") to protect its residents,

   d. Partially defined a few residential classifications under the IBC and stated that by permitting residents between the ages of 0-18, AUNT MARTHA's use of the single-family dwelling would be classified as the much stricter classification Institutional Group 2, such as a nursing home or psychiatric care facility, and

   e. Informed AUNT MARTHA's that under **no circumstances** would it be permitted to accept residents between 0-18 years of age in violation of the IBC and Midlothian Village Code. (emphasis added).

79)     On or about April 23, 2020, after having previously performed a walk-through at the CQC, DCFS issued a license to AUNT MARTHA's for the operation of the CQC program located at AUNT MARTHA's single-family dwelling in Midlothian.

80)     Beginning on or about April 24, 2020, AUNT MARTHA's began admitting minors, adjudicated Wards of the court each of whom are persons with handicaps to it's the CQC because

they have either tested positive and/or have been exposed to COVID-19 and required to be quarantined.

81)     On April 24, 2020, Cummings sent a letter via email to Murphy stating that AUNT MARTHA's and its counsel was not in agreement with the VILLAGE OF MIDLOTHIAN's interpretation of the definition of "Community Residence" to not allow AUNT MARTHA's use of the single-family dwelling, was not in agreement with the classification under the IBC that the VILLAGE OF MIDLOTHIAN had attributed to AUNT MARTHA's use of the single-family dwelling, and welcoming an opportunity to discuss the matter in an attempt to come to a mutual understanding.

82)     On April 27, 2020, Murphy sent an email to Cummings in response to the April 24, 2020 letter requesting the names of AUNT MARTHA's outside counsel so that Murphy could determine who would participate in a call on behalf of the VILLAGE OF MIDLOTHIAN, to which Cummings responded the same morning with the requested information.

83)     On May 1, 2020, having not heard back from outside counsel, Cummings sent a letter to Murphy again requesting days and times that a call between counsel for AUNT MARTHA's and counsel for the VILLAGE OF MIDLOTHIAN could occur in an attempt to come to a mutual understanding and requesting that a call be scheduled by no later than May 4, 2020.

84)     On May 4, 2020 Murphy sent an email stating that the VILLAGE OF MIDLOTHIAN was unable to accommodate AUNT MARTHA's request for a call that day, but that a telephone conference could be scheduled for the following day, May 5, 2020.

85)     On May 5, 2020, a call took place between Murphy, Weinert, Cummings and AUNT MARTHA's outside counsel to discuss the VILLAGE OF MIDLOTHIAN's position on AUNT MARTHA's use of its single-family dwelling.

86)     On May 6, 2020, Cummings sent a letter to Murphy and Weinert regarding the conversation that took place the day prior. In that letter, Cummings:

     a.  Noted the VILLAGE OF MIDLOTHIAN's continued interpretation of the definition of "Community Residence" to only allow individuals between the ages of 18-24 despite language to the contrary within the definition;

     b.  Informed the VILLAGE OF MIDLOTHIAN that AUNT MARTHA's still disagreed with the VILLAGE OF MIDLOTHIAN's interpretation of the zoning code and the classification attributed to AUNT MARTHA's use of the single-family dwelling by the VILLAGE OF MIDLOTHIAN;

     c.  Informed the VILLAGE OF MIDLOTHIAN that it was AUNT MARTHA's continued belief that the zoning code allows AUNT MARTHA's use on its face;

     d.  That AUNT MARTHA's currently meets the applicable building code requirements; and,

     e.  Requested that the VILLAGE OF MIDLOTHIAN inform AUNT MARTHA's by the end of the day on May 8, 2020 whether it was willing to cooperate with AUNT MARTHA's and allow its use of the single-family dwelling.

87)     On May 8, 2020, Murphy sent an email to Cummings in response to the May 6, 2020 letter from Cummings stating that the VILLAGE OF MIDLOTHIAN's Board had met and that the VILLAGE OF MIDLOTHIAN would require AUNT MARTHA's to file for a special use permit in order to serve any individuals under the age of eighteen (18) years old at the single-family dwelling.

## COUNT I

**THE VILLAGE OF MIDLOTHIAN'S UNLAWFUL APPLICATION
OF ITS "COMMUNITY RESIDENCE" ORDINANCE & BUILDING CODES
VIOLATES THE FAMILIAL STATUS PROTECTIONS
UNDER THE FAIR HOUSING ACT**

88)     The allegations listed above in paragraphs 1 through 87 are incorporated herein by reference.

*Dwelling*

89)     AUNT MARTHA's single-family dwelling in the Midlothian is a "dwelling" occupied as residence by a family, a use protected under federal Fair Housing Act.

90)     Under the Fair Housing Act, "'Dwelling' means any building . . . which is occupied as . . . a residence by one or more families . . .. 42 U.S.C. §3602(b).

*Familial Status*

91)     The individuals residing in AUNT MARTHA's single-family dwelling are children and youth in the legal custody of DCFS.

92)     DCFS has designated AUNT MARTHA's – a not for profit corporation - as responsible for their physical custody and care.

93)     Consequently, the children and DCFS Youth-In-Care residing in AUNT MARTHA's single-family dwelling are accorded a "familial status" protected under the federal Fair Housing Act.

94)     Under the Fair Housing Act, "familial status" means "one or more individuals (who have not attained the age of 18 years) being domiciled with another person having legal custody of such individual or individuals; or the designee of . . . person having such custody. . .." 42 U.S.C. §3602(k)(2).

95)     Under the Fair Housing Act, "Person includes one or more individuals, *corporations*, partnerships, associations, labor organizations, *legal representatives*, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11 [of the United States Code], receivers, and fiduciaries." (emphasis added).

***Unlawful Discriminatory Application of "Community Residence" Ordinance***

96)     Section 11-16-3 of the VILLAGE OF MIDLOTHIAN zoning code defines a "Community Residence," as follows (emphasis added):

"Community Residence, Large." This use includes residential facilities shared by 24-hour resident staff and seven (7) or more disabled individuals, elderly individuals, ***minors, adjudicated wards of the Court (under the Illinois Juvenile Court Act or the Illinois Probate Act***, or individuals, who are 18 to 24 years of age, are not wards of the Court and who require specialized attention and care (including, but not limited to, life skill education, therapy or counseling) in order to achieve personal independence, who live together as a single housekeeping unit in a long-term, family-like environment, where staff provide care, and facilitate education and participation in community activities for the residents in order for them to live independently as possible in a residential environment, This use shall not include institutional "Assisted Living Facility," as defined herein, or an alcohol or drug treatment center, a work release facility for convicts or ex-convicts, or other facilities serving as an  alternative to incarceration.

"Community Residence, Small." This use includes residential facilities shared by 24-hour resident staff and six (6) or less disabled individuals, elderly individuals, ***minors, adjudicated wards of the Court (under the Illinois Juvenile Court Act or the Illinois Probate Act***, or individuals, who are 18 to 24 years of age, are not wards of the Court and who require specialized attention and care (including, but not limited to, life skill education, therapy or counseling) in order to achieve personal independence, who live together as a single housekeeping unit in a long-term, family-like environment, where staff provide care, and facilitate education and participation in community activities for the residents in order for them to live independently as possible in a residential environment, This use shall not include institutional "Assisted Living Facility," as defined herein, or an alcohol or drug treatment center, a work release facility for convicts or ex-convicts, or other facilities serving as an  alternative to incarceration.

97)     Prior to April 2020, AUNT MARTHA's single-family dwelling in Midlothian had been allowed by the VILLAGE OF MIDLOTHIAN to be used as a "Community Residence" as a ***permitted use*** under Section 11-6-2 of its zoning code.

98)     During April and continuing in May 2020, the VILLAGE OF MIDLOTHIAN intentionally and wrongfully refused, and continues to refuse, to apply its zoning code to allow AUNT MARTHA's single-family dwelling to be used as a "Community Residence" for the children and DCFS Youth-In-Care residing there, despite the fact that its zoning ordinance – *on its face* – expressly and explicitly provides that a "Community Residence" is a permitted use for "minors" as well as "adjudicated wards of the Court under the Illinois Juvenile Court Act or the Illinois Probate Act."

99)     Instead, the VILLAGE OF MIDLOTHIAN intentionally and wrongfully refuses, and continues to refuse, "under any circumstances" to allow AUNT MARTHA's to use its single-family dwelling for the children and youth residing there until AUNT MARTHA's obtains a "text amendment" to the zoning code or a "special use permit" from the VILLAGE OF MIDLOTHIAN.

*Unlawful Discriminatory Application of the Building Code*

100)     In addition, during April 2020, the VILLAGE OF MIDLOTHIAN intentionally and wrongfully refused, and continues to refuse, to apply its building code's requirements related to a "Community Residence" by denying AUNT MARTHA's applications for a building permit for renovations.

101)     Instead, the VILLAGE OF MIDLOTHIAN intentionally and wrongfully insists that it will not "under any circumstances" approve AUNT MARTHA's applications for a building permit for renovations unless AUNT MARTHA's complies with  the stricter "institutional" use and occupancy building code standards equivalent to "nursing homes, psychiatric care facilities."

102)     The federal Fair Housing Act (42 U.S.C. §3604) declares it unlawful:

a.  "to . . . make unavailable . . . a dwelling to any person because of familial status . . . ;

b.  to discriminate against any person . . . in the provision of services or facilities . . . because of . . . familial status . . ., or

23

c. to make . . . or cause to be made . . . any statement . . . that indicates any . . . limitation, or discrimination based on . . . familial status . . ., or an intention to make any such . . . limitation, or discrimination." 42 U.S.C. §3604(a-c).

103)    In addition, the federal Fair Housing Act declares it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted to protected by Section . . . 804." 42 U.S.C.§3617.

104)    The VILLAGE OF MIDLOTHIAN's intentional and wrongful refusal to apply its Community Residence zoning ordinance and related building code requirements in defiance of "familial status" protections afforded the children and DCFS Youth-In-Care residing in AUNT MARTHA's single-family dwelling:

a. make AUNT MARTHA's single-family dwelling home unavailable to the children and youth despite their protected familial status under the federal Fair Housing Act, in violation of 42 U.S.C. §3604(a); and

b. discriminate in the provision of services and facilities by AUNT MARTHA's to the children and DCFS Youth-In-Care on account of familial status of the youth under the federal Fair Housing Act, in violation of 42 U.S.C. §3604(b); and

c. making statements indicating a limitation or discrimination based on the familial status of the youth, or an intention to make such a limitation or discrimination, in violation of 42 U.S.C. §3604(c); and

d. interfering with AUNT MARTHA's on account of it having aided or encouraged the youth in the exercise or enjoyment of rights granted or protected by the Fair Housing Act, 42 U.S.C. §3617.

## COUNT II

**THE VILLAGE OF MIDLOTHIAN'S UNLAWFUL APPLICATION
OF ITS "COMMUNITY RESIDENCE" ORDINANCE & BUILDING CODES
VIOLATES PROTECTIONS AFFORDED HANDICAPPED PERSONS
UNDER THE FAIR HOUSING ACT**

105) The allegations listed above in paragraphs 1 through 87 are incorporated herein by reference.

106) Under the federal Fair Housing Act, "handicap" means, with respect to a person,

- a physical or mental impairment which substantially limits one or more of such person's major life activities,

- a record of having such an impairment, or

- being regarded as having such an impairment..." 42 U.S.C. §3602.

107) Each of the children and youth residing in AUNT MARTHA's single-family dwelling have a "handicap" within the meaning of the Fair Housing Act, including mental, behavioral, developmental, and/or COVID-19-related disabilities.

108) The federal Fair Housing Act declares it unlawful:

a. "to . . . make unavailable . . . a dwelling ... because of ...handicap of . . .a person residing or intending to reside in that dwelling...", 42 U.S.C. §3604(f)(1)(B), or

b. "to discriminate against any person . . . in the provision of services or facilities . . . because of a handicap of a person residing or intending to reside in that dwelling..." 42 U.S.C. §3604(f)(2)(B).

109) Under the Fair Housing Act, discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling," 42 U.S.C. §3604(f)(3)(B).

110) The VILLAGE OF MIDLOTHIAN's unlawful and wrongful refusal to apply its Community Residence zoning ordinance and related building code requirements in defiance of

protections afforded by the FHA to the children and DCFS Youth-In-Care with a "handicap" and residing in AUNT MARTHA's single-family dwelling unlawfully interferes with AUNT MARTHA's ability to make available a single-family home to children and DCFS Youth-In-Care.

111)    The VILLAGE OF MIDLOTHIAN has refused to make reasonable accommodation in its rules, policies, practices, or services necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling, a discrimination based on handicap prohibited by the federal Fair Housing Act.

112)    The VILLAGE OF MIDLOTHIAN's continuing unlawful and wrongful actions and its continuing failure to make a reasonable accommodation:

   a. make the AUNT MARTHA's single-family dwelling unavailable to the children and DCFS Youth-In-Care with "handicaps" in violation of 42 U.S.C. §3604(f); and

   b. discriminate in the provision of services and facilities by AUNT MARTHA's to children and DCFS Youth-In-Care with "handicaps" in violation of 42 U.S.C. §3604(f); and

   c. Make statements indicating a limitation or discrimination based on the "handicaps" of the youth, or an intention to make such a limitation or discrimination, in violation of 42 U.S.C. §3604(c); and

   d. interfering with AUNT MARTHA's on account of it having aided or encouraged the youth in the exercise or enjoyment of rights granted or protected by the Fair Housing Act, in violation of 42 U.S.C. §3617.

## COUNT III

### THE VILLAGE OF MIDLOTHIAN'S UNLAWFUL APPLICATION OF ITS "COMMUNITY RESIDENCE" ORDINANCE & BUILDING CODES VIOLATE PROTECTIONS AFFORDED QUALIFIED INDIVIDUALS WITH A DISABILIY UNDER THE AMERICANS WITH DISABILITIES ACT

113)   The allegations listed above in paragraphs 1 through 87 are incorporated herein by reference.

114)   The prospective residents of the home are "qualified individuals with a disability" within the meaning of 42 U.S.C. §12131 (2) and 28 C.F.R. §35.104.

115)   Plaintiff AUNT MARTHA's is an entity associated with "qualified individuals with a disability" within the meaning of 42 U.S.C. §12131 (2) and 28 C.F.R. §35.104.

116)   The VILLAGE OF MIDLOTHIAN is a "public entity" within the meaning of 42 U.S.C.§12131(1).

117)   The VILLAGE OF MIDLOTHIAN's actions, including the enactment of zoning ordinances and building codes are "services, programs, or activities" of a public entity within the meaning of 42 U.S.C. §12132.

118)   The VILLAGE OF MIDLOTHIAN's actions described above:

a.   constitute discrimination in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130 *et. seq.*;

b.   exclude qualified individuals with disabilities from participation and deny them the benefits of the services, programs, or activities of a public entity on the basis of disability in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(a);

c.   afford qualified individuals with disabilities an opportunity to participate in or benefit from the services of a public entity that are not equal to those afforded others in violation of Title II of the ADA, 42 U.S.C. §12132, and its implementing regulation, 28 C.F.R. §35.130(b)(l)(ii).

## COUNT IV

**THE VILLAGE OF MIDLOTHIAN'S UNLAWFUL APPLICATION
OF ITS "COMMUNITY RESIDENCE" ORDINANCE & BUILDING CODES
VIOLATE PROTECTIONS AFFORDED QUALIFIED INDIVIDUALS WITH A DISABILIY
UNDER SECTION 504 OF THE REHABILITIAON ACT OF 1973**

119) The allegations listed above in paragraphs 1 through 87 are incorporated herein by reference.

120) The VILLAGE OF MIDLOTHIAN is a recipient of federal financial assistance.

121) The current and future residents (DCFS Youth-In-Care) of the CQC are "qualified individuals with a disability" within the meaning of 29 U.S.C. §794(a).

122) The VILLAGE OF MIDLOTHIAN's zoning and building codes are "programs or activities" of a unit of local government within the meaning of 29 U.S.C. §794(b)(I)(A).

123) The VILLAGE OF MIDLOTHIAN's actions described above:

a.   constitute discrimination in violation of Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. §794, and its implementing regulation, 24 C.F.R. Part 8;

b.   exclude qualified individuals with disabilities from participation in and deny them the benefits of the services, programs, or activities receiving federal financial assistance on the basis of disability others in violation of Section 504, 29 U.S.C. §794, and its implementing regulation, 24 C.F.R. 8.4(b )(1) (i);

c.   afford qualified individuals with disabilities an opportunity to participate in or benefit from the services, programs, or activities receiving federal financial assistance that are not equal to those afforded others in violation of Section 504, 29 U.S.C. §794, and its implementing regulation, 24 C.F.R. 8.4(b)(l)(ii);

e.   otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service in violation of Section 504, 29 U.S.C. §794, and its implementing regulation, 24 C.F.R. 8.4(b )(I)(viii); and

f.   fails to make reasonable modifications in policies, practices, or procedures necessary to avoid discrimination on the basis of disability in violation of Section 504, 29 U.S.C §794 and its implementing regulations, 24 C.F.R. 8.3. 24 C.F.R. 8.24, 24 C.F.R. 8.28, and 24 C.F.R. 8.33.

124)     The VILLAGE OF MIDLOTHIAN's actions described above were intentional and taken with willful disregard for Plaintiff's rights.

125)     Plaintiff AUNT MARTHA's is a "person aggrieved" within the meaning of 29 U.S.C. §794(a)(2) who have suffered harm and damages by the actions of the VILLAGE OF MIDLOTHIAN described above.

126)     Plaintiff AUNT MARTHA's is without an adequate remedy at law.

127)     Plaintiff AUNT MARTHA's will suffer irreparable harm if the VILLAGE OF MIDLOTHIAN's refuses to allow the continued operation of the CQC.

WHEREFORE, Plaintiff AUNT MARTHA's prays that this Court enter an ORDER:

a. Declaring that the VILLAGE OF MIDLOTHIAN's actions violate the FHA, ADA and Section 504 of the Rehabilitation Act and its implementing regulations;

b. Granting a preliminary injunction enjoining the VILLAGE OF MIDLOTHIAN's from issuing cease and desist orders, initiating eviction proceedings or taking any other actions that interferes with AUNT MARTHA's CQC use or against CQC residents (DCFS Youth-In-Care) during the pendency of these proceedings;

d. Granting a permanent injunction enjoining the VILLAGE OF MIDLOTHIAN's from issuing cease and desist orders, initiating eviction proceedings or taking any other actions that interfere with AUNT MARTHA's CQC use or against CQC residents (DCFS Youth-In-Care);

e. Awarding Plaintiff AUNT MARTHA's its costs, expenses, and reasonable attorney's fees; and

f. Granting any additional relief as the Court deems just and proper.

May 12, 2020

Respectfully Submitted

/s Ricardo Meza
Ricardo Meza

Ricardo Meza, ARDC # 6202784
Meza Law #18159
161 N. Clark Street, Ste. 1610
Chicago, IL 60601
(312) 802-0336
rmeza@meza.law

Roger B. Derstine, Chtd. ARDC #0620742
3550 North Lakeshore Drive Suite 2504
Chicago, IL 60657
(312) 593-3370
rderstine@rbdlaw.net

# Exhibit 1



# *Office of the State Fire Marshal*

## **INSPECTION REPORT**

| | | | |
|---|---|---|---|
| **Occupant Name:** | Aunt Martha's Children's Quarantine Center | **Inspection Date:** | 4/20/2020 |
| **Address:** | 14401 South Pulaski Road | **Occupant Number:** | CS-079-1586880094102 |
| **Structure Name:** | | **InspectionType:** | Res. Bd. & Care (New, Large) - 2015 |
| **Suite:** | | **Requested By:** | Aunt Marthas |
| **City:** | MIDLOTHIAN | | |
| **State:** | IL | | |
| **Zip Code:** | 60445 | | |
| **Inspected By:** | Thomas Wendt Office of the State Fire Marshal JRTC - 100 W. Randolph, Suite 4-600 Chicago, IL 60601 Fax: 312/814-3459 217-993-2178 | **Property Owner:** | Philoniese Moore (773) 451-4600 |
| **Important Info for Firefighters:** | Number of Clients/Occupants: 8 Occupancy Established Date: 4/2/2020 License Expiration Date: Evacuation Capability: Prompt Age of clients / occupants: 0-21 Areas & Floor levels to be used: Entire Two Floors Specific Information: No Sleeping In Basement Areas | | |

**Inspections are conducted under the authority of the Illinois Fire Investigation Act (425 ILCS 25) and the Fire Prevention and Safety Administrative code (41 Illinois Administrative Code Part 100) as promulgated by the Office of the Illinois State Fire Marshal (OSFM).**

**No violations were observed during this inspection. However, you remain responsible for maintaining compliance with all applicable fire and life safety codes promulgated by the Office of the Illinois State Fire Marshal.**

**Inspector Comments:** No violations at time of inspection.....

COVID-19 Emergent Facility

Case: 1:20-cv-02861 Document #: 1 Filed: 05/12/20 Page 33 of 33 PageID #:33

Inspections are conducted under the authority of the Illinois Fire Investigations Act (425 ILCS 25) and the Fire Prevention and Safety Administrative code (41 Illinois Administrative Code Part 100) as promulgated by the Office of the Illinois State Fire Marshal (OSFM.

This inspection report is subject to review by the Regional Administrator.  You will be notified in writing within ten (10) business days if any, or part of this inspection report has been modified.